IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 08-cv-01817-RPM

ADESTA COMMUNICATIONS, INC., a Delaware corporation,

    Plaintiff,
v.

UTICA MUTUAL INSURANCE COMPANY, a New York corporation,

    Defendant.

___

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

___

  In March, 1999, Adesta Communications, Inc., formerly known as MFS Network Technologies, Inc. ("Adesta" or "the Plaintiff"), entered into a contract with the State of Colorado, for a project involving Adesta's installation of telecommunications facilities in certain locations in interstate and other controlled access highway rights-of-ways owned by the Colorado Department of Transportation ("CDOT"). Pursuant to this contract, CDOT granted a license to Adesta for portions of the subject rights-of-way. (*See* Def.'s Ex. 3, the "License Agreement or the "Prime Contract.")

  On or about February 18, 2000, the Plaintiff entered into a subcontract with Lee Engineering & Construction Co. ("Lee Engineering"), in which Lee Engineering agreed to design, engineer, furnish and install certain fiber optic conduit and telecommunication facilities in an area of northwest Denver, specifically, a line approximately 3.8 miles long, referred to as the

Backbone Five, located in the right-of-way between the intersection of 13th and Shoshone Streets and the intersection of Zuni Street and Interstate 70. (Def.'s Ex. 1, "the Subcontract.")

The Subcontract incorporated all terms of the License Agreement. The License Agreement required all work to be performed "in a safe and workmanlike manner consistent with generally accepted construction standards . . . . " (Def.'s Ex. 3, § 18(A), p. 10.)

The Subcontract required Lee Engineering to provide a performance and payment bond in the sum of $2,958,870, the amount Lee Engineering was to be paid for performing its portion of the Prime Contract. On or about February 18, 2000, Lee Engineering (as principal) and Utica Mutual Insurance Company (as surety) entered into the required bond. (Def.'s Ex. 4, "the Bond"). Adesta accepted the Bond.

The Subcontract provided for a completion date of June 27, 2000. That date was superseded by multiple change orders, the last of which was dated June 13, 2001. (Def.'s Ex. 5.)

Lee completed most of the work described in the Subcontract, but did not complete some final restoration work. John R. Horan, a Regional Manager for Adesta, testified in his deposition that he believed that Lee Engineering "pulled off the job" before completing the final restoration work due to payment issues. (Def.'s Ex. 2, Horan dep. at 29:12 – 19.) Horan said that after all the fiber optic conduit had been installed, Adesta hired another subcontractor to complete the final restoration work, which consisted of replacing 10 to 15 patches of asphalt, a few sidewalk panels and some landscaping restoration. (Pl.'s Ex. 1, Horan Decl. ¶ 6; Horan dep. at 29:16 – 30:24.) That final restoration work was completed in early 2002. Sometime around July 2003, Adesta installed fiber optic cable in the conduit installed by Lee Engineering.

In April, 2007, the City and County of Denver ("Denver") notified Adesta that Denver's sanitary sewer had been breached and damaged near 32nd and Zuni Streets. Denver claimed that the damage to the sewer line, approximately ten feet underground, occurred during the installation of the fiber optic conduit. Representatives of Adesta inspected the damage and determined that the damage had been caused by Lee Engineering. Adesta paid approximately $149,000 to repair the damage to the sewer line.

The Plaintiff has submitted a report of Horan, who described the cause of the damage as follows:

> a. . . . Lee Engineering and Construction Company caused the damage to the 18" sanitary sewer line at issue, during its installation of the fiber optic cable for Adesta Communications. The damaged area of the sewer line was unquestionably caused by a back reamer. A back reamer is a part of a directional bore machine used to install conduit, and is a metal part with teeth that is pulled back through a hole that has been made and it spins during that process. The fiber optic conduit that was installed for Adesta Communications (which installation was subcontracted to Lee Engineering) was the only conduit in the area, and much of it was in the pea gravel backfill within inches or on top of the sanitary sewer line. This fiber optic line was installed by Lee Engineering using directional boring methods, and it was evident that when the line was bored in, it was directly adjacent to the sewer line, and the backreamer had damaged the side of the sewer line.
>
> b. Lee Engineering and Construction failed to comply with the clearance requirements in installing the fiber optic conduit. The minimum clearance distance from other utility structures is twelve inches.
>
> c. Lee Engineering and Construction's work in installing the [sic] was defective and not in accordance with the standards of the industry.
>
> d. The standard of care in the industry in installing fiber optic conduit with the directional bore method includes in part insuring that a boring is at all times at least two feet away from other utility structures.
>
> e. Lee Engineering and Construction breached the standard of care in installing the fiber optic conduit at the location at issue.

      f.      The damage at issue to the sewer line was latent and would not have been discovered by the exercise of reasonable diligence. The damage was about ten feet deep. The damage was towards the top and sides of the sewer line. The damage to the sewer line was not noticed until such a late date because it did not completely block the sewer line upon the destruction occurring. Over time, the sewer pipe was blocked by pieces of the pipe collapsing into it, along with sediment coming into the sewer from the damaged locations.

(Ex. A to Horan decl.) Horan's opinion is based on his visual inspection of the damage in April 2007, video tests performed by Denver, photographs, and bore logs relating to the installation of the fiber optic conduit.

On November 6, 2007 and again on January 15, 2008, Adesta demanded payment under the surety bond. Utica denied Adesta's demands for payment.

On January 30, 2008, Adesta filed this action against Utica, alleging that Lee Engineering breached the terms of the Subcontract and that Utica has failed to honor its payment obligation under the Bond. The Complaint seeks judgment against Utica for "(1) costs to repair the damage as demanded by the City/County of Denver; (2) costs to repair and replace the fiber optic conduit and other installed materials; (3) incidental and consequential damages including but not limited to costs and professional fees expended to respond to the City/County Denver's complaint; and (4) interest and penalties as provided for by the Contract and by law." (Compl. ¶ 14.) The Plaintiff also seeks its attorney fees and other costs of this litigation. (Compl. ¶18 & Wherefore Clause.) Jurisdiction is based on diversity of citizenship.

Utica answered the Complaint, denying liability.

On January 11, 2010, Utica moved for summary judgment of dismissal, arguing that Adesta's claim is barred by the applicable statute of limitations and that the Bond is void. Adesta

responded and moved for partial summary judgment, determining that Utica is liable under the Bond.

The Subcontract provides that it is governed by the law of the State of Colorado. The parties agree that the substantive law of Colorado governs this dispute.

The applicable statute of limitations is in C.R.S. § 13-80-101(a), requiring that all contract actions "shall be commenced within three years after the cause of action accrues." C.R.S. § 13-80-108(6) provides that "[a] cause of action for breach of any express or implied contract, agreement, warranty or trust shall be considered to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence."

Utica asserts that the Subcontract was breached when Lee Engineering failed to finish the final restoration work, and this purported breach occurred by at least early 2002, when Adesta finished the work using a different subcontractor, and accordingly any claim under the Bond was time-barred after early 2005.

Utica's argument is contrived. The Plaintiff's present claims are not based on Lee Engineering's obligation to complete the final restoration work. The Plaintiff's damages are claimed to be the result of faulty work by Lee Engineering creating a latent defect, which could not have been discovered before April 2007. Horan's declaration supports the Plaintiff's contention. Utica has not submitted any evidence to the contrary. The Plaintiff's claim accrued in April 2007, and is not time-barred.

Utica argues that the Bond is void by operation of the following language in the Bond:

> NOW, THEREFORE, if the said Principal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions and agreements of said subcontract during the original term of said subcontract and any extensions thereof that may be granted by the Contractor, with or without notice to the Surety, and during the life of any guaranty required under the subcontract, and shall also well and truly perform and fulfill all the undertakings, covenants, terms, conditions and agreements of any and all duly authorized additions to and modifications of said subcontract that may hereafter be made, notice of which additions and modifications to the Surety being hereby waived, and shall promptly make payment to all persons supplying the Principal with labor and materials in the prosecution of the work provided for in said subcontract, and any and all duly authorized additions to and modifications of said subcontract that may hereafter be made, and shall promptly pay all other obligations incurred by the Principal in connections with such work, ***then this obligation to be void***; otherwise to remain in full force and effect.

(Def.'s Ex. 4, at pp. 1-2 (emphasis added)). Utica contends that this paragraph shows that the Bond was intended to be effective for only a limited period, defined by the original term of the Subcontract (and any extensions thereof) and any guaranty period required under the Subcontract.

Section 8 of the Subcontract provided as follows:

> **Section 8.   Warranty.**   Subcontractor warrants and guarantees to Owner and Contractor the Work covered by this Subcontract for a period of time specified in the Contract Documents, but not for less than a period of one (1) year from the date Owner accepts such Work. Any defective work or Work failing to conform to the Contract Documents which is rejected by Owner within (1) year of Owner's acceptance of the Work performed by Subcontractor hereunder (whether such defects are observed before or after Owner's acceptance of the Work shall be promptly corrected by Subcontractor; however, the foregoing shall not be construed to establish a period of limitation with respect to Subcontractor's other obligations under this Subcontract and the foregoing relates only to the specific obligation of Subcontractor to correct the Work and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish Subcontractor's liability with respect to Subcontractor's obligations other than correction of the Work.

The one-year period described in the first sentence of section 8 of the Subcontract is the only warranty period described in the contract documents.

The Bond also provides:

> . . . the Contractor may, at its option and without notice to Surety, pay to Principal any sums earned by Principal under said subcontract, including any retained percentage thereon, prior to the time of final approval and acceptance of the Principal's work and materials by the Owner; and in the event of any such payment to the Principal herein, all of the terms, conditions and obligations of such subcontract and of this bond shall remain in full force and effect until the final approval and acceptance of the Principal's work and materials by the Owner and until the expiration of any guaranty under said subcontract.

(Def.'s Ex. 4, paragraph (a).) Utica argues that this language shows that the Bond was intended to be of limited duration and became void upon Adesta's final approval and acceptance of Lee Engineering's work and expiration of the one-year warranty period described above. Utica states that Adesta accepted Lee Engineering's work and made final payment no later than July 2003, and the one-year warranty period expired in July 2004. Utica asserts that these events terminated Lee's performance obligations under the Subcontract and Utica's surety obligation under the Bond.

Utica's position is contrary to the Bond language, which provides that it becomes void only *if* the Principal (Lee) performed its obligations according to the terms of the Subcontract during the term of the Subcontract and any guaranty period. The facts and conclusions set forth in Horan's report show that Lee Engineering did not perform its obligations under the Subcontract during those periods because Lee breached its duty to comply with generally accepted construction standards. Utica does not challenge Horan's assessment of the cause of the damage or his description of the defect as latent.

Section 8 of the Subcontract, read in its entirety, does not limit a claim by Adesta for defective work by the Subcontractor. This language is consistent with section 3(i) of the Subcontract, which provides that final payment "shall not constitute a waiver of claims by Owner

or [Adesta] arising from . . . (b) faulty or defective work, [or] (c) failure of the Work to comply with the requirements of the Contract Documents . . . ."

Under the circumstances presented here, the only temporal limitation on Utica's payment obligation is the applicable statute of limitations, and the claim is not time-barred because the defect was latent.

Accordingly, it is

ORDERED that the Defendant's motion for summary judgment [dkt. 34] is denied; and it is

FURTHER ORDERED that the Plaintiff's motion for partial summary judgment [dkt. 36] is granted.

Dated: March 19, 2010

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge